Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

# UNITED STATES DISTRICT COURT

for the

CENTRAL District of CALIFORNIA

_____ Division

| FILED |
|---|
| CLERK, U.S. DISTRICT COURT |
| **06/30/2023** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ DVE _____ DEPUTY |

Gregory Edward Gray

_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

**-v-**

Housing Authority of the City of Los Angeles

_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued.  If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.   2:23-cv-05224-JGB-(KES)
_____

*(to be filled in by the Clerk's Office)*

IFP Submitted

## COMPLAINT AND REQUEST FOR INJUNCTION

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Gregory Edward Gray |
| Street Address | 3183 Wilshire Boulevard, Ste., 196K26 |
| City and County | Los Angeles, Los Angeles County |
| State and Zip Code | California 90010 |
| Telephone Number | (213) 638-2039 |
| E-mail Address | gegcbg@outlook.com |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Housing Authority of the City of Los Angeles |
| Job or Title *(if known)* | |
| Street Address | 2600 Wilshire Boulevard |
| City and County | Los Angeles, Los Angeles County |
| State and Zip Code | California 90057 |
| Telephone Number | (213) 252-2500 |
| E-mail Address *(if known)* | James.Johnson@hacla.org  (c/o James Johnson, Jr., HACLA General Counsel) |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

[X] Federal question          [ ] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

This court has jurisdiction under 28 U.S.C. § 1331 AND U.S.C. § 1343. Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

   a.    If the plaintiff is an individual

   The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

   b.    If the plaintiff is a corporation

   The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

   a.    If the defendant is an individual

   The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

b.    If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under

the laws of the State of *(name)* _____, and has its

principal place of business in the State of *(name)* _____.

Or is incorporated under the laws of *(foreign nation)* _____,

and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

Los Angeles County

_____

B.    What date and approximate time did the events giving rise to your claim(s) occur?

These events occurred between January 2022 and June 2023.

_____

C.       What are the facts underlying your claim(s)?   *(For example:  What happened to you?  Who did what?*
         *Was anyone else involved?  Who else saw what happened?)*

Plaintiff has an emergency housing voucher from the Housing Authority of the City of Los Angeles.
The voucher is due to expire on July 2, 2023.  The Los Angeles County Housing Services Authority and its
subordinate service providers (The Salvation Army, People Assisting The Homeless, First To Serve) have:
1) repeatedly ignored the Plaintiff's documented disabilities and medical challenges that must be addressed
in order for Plaintiff to be successful in securing permanent housing that meets Plaintiff's needs; 2) stalled
the process of completing paperwork needed to secure permanent housing; 3) lost paperwork submitted by
Plaintiff to secure permanent housing; 4) submitted inaccurate information misrepresenting Plaintiff in the
paperwork process to secure permanent housing; and 5) otherwise caused Plaintiff to lose valuable time to
use Plaintiff's emergency housing voucher to secure permanent housing before said voucher expires.
(PLEASE SEE ADDITIONAL PAGES ATTACHED.)

IV.   **Irreparable Injury**

Explain why monetary damages at a later time would not adequately compensate you for the injuries you
sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation
could not be measured.

Plaintiff cannot place a monetary value on damages because the issue is of a medical nature.  In multiple
physician letters documenting Plaintiff's medical condition, said letters state that:  "

> He currently has multiple medical problems which includes vertigo,
> hypercholesterolemia, hypertension, insulin- dependent diabetes, a history of multiple
> strokes with residual left sided weakness , foot drop requiring a walker and memory
> problems. His last clinic visit was 5/17/2023 and at that time he was still in interim
> housing. Given the complexity of his medical problems, his disabilities (memory,
> ambulation), and diabetes care requirements (insulin which requires personal fridge),
> housing to facilitate his care, to prevent adverse outcomes (recurrent stroke, heart
> attack, or demise) and hospitalizations, appropriate housing is essential for Mr. Gray
> and his caretakers.

V.   **Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages.

Plaintiff is seeking full restoration of time in the amount of 365 days for an emergency housing voucher
issued by the Housing Authority of the City of Los Angeles.  Plaintiff is also seeking to halt the current
expiration date of said voucher which is July 2, 2023.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## VI.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:              6/30/23

Signature of Plaintiff          /s/ Gregory Edward Gray
Printed Name of Plaintiff        Gregory Edward Gray

### B.      For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Street Address
State and Zip Code
Telephone Number
E-mail Address

## C. STATEMENT OF FACTS (CONTINUED)

Paragraph 1

The issuing agency for the voucher is the Housing Authority of the City of Los Angeles also known as HACLA. The County of Los Angeles and the City of Los Angeles are working partners with the Los Angeles Housing Services Authority which is also known as LAHSA. The Department of Housing and Urban Development, also known as HUD, is the funding arm for the emergency housing voucher program. Plaintiff has corresponded with all of the aforementioned parties to alert each to Plaintiff's health challenges and to attempt to resolve the other issues stated herein that directly impact Plaintiff's success in securing permanent housing using the Plaintiff's emergency housing voucher.

Paragraph 2

Plaintiff brought his concerns to HUD in correspondence dated January 13, 2023. HUD scheduled a telephone conference call that occurred on or about February 21, 2023 with Plaintiff.  During that conference call, HUD officials Rufus Washington and Nathaniel King advised Plaintiff that HUD had the authority to extend Plaintiff's emergency housing voucher because the voucher program is under HUD authority.

Paragraph 3

As follow up to the February 21, 2023 telephone conference with HUD, Plaintiff complied with a HUD request to send documentation that chronicled all of the problems that Plaintiff has encountered with the aforementioned agencies in trying to secure permanent housing.  Plaintiff provided documentation chronicling the time that said agencies wasted, including the agencies' collective failure to acknowledge Plaintiff's multiple medical challenges.

Paragraph 4

On April 24, 2023, Plaintiff wrote to HUD to report everything that had occurred pertaining to the continuing delay imposed upon Plaintiff in securing permanent housing by HUD-funded agencies since the date of Plaintiff's February conference call with HUD.  Plaintiff requested that HUD fulfill its pledge to extend Plaintiff's emergency housing voucher. Plaintiff made the extension request to HUD because HUD officials told Plaintiff that they were ultimately in charge of extending the voucher. On or about April 25, 2023, HUD officials passed the matter onto the Housing Authority of the City of Los Angeles also known as HACLA.

Paragraph 5

HACLA has the ability to grant Plaintiff's emergency housing voucher extension request pursuant to a HUD-issued document published on May 4, 2023, entitled, "EMERGENCY HOUSING VOUCHER FAQ.  On page 17, paragraph 52, the document reads as follows: *"Can PHAs provide additional search time after the initial 120-day search term has expired if the family still has not found a unit? (NEW) Yes. After the minimum-required 120-day initial search term, the PHA would apply their policy on granting extensions in accordance with their administrative plan.* ***PHAs are reminded that there is no limit on the number of extensions that can be granted, and per 24 CFR § 982.303(b)(2), a PHA must grant reasonable accommodation requests to extend the search term that may be necessary for individuals with disabilities to find a unit that meets their needs."***

Paragraph 6

Plaintiff complied with a HACLA request to submit a Special Accommodation Form stating the need for an extension of the expiration date.  Plaintiff accompanied that form with two physician letters documenting his disabilities, health challenges and need for special

accommodation. The form and accompanying physician letters were forwarded to HACLA via DOCU-SIGN on May 9, 2023.

Paragraph 7

On May 25, 2023, HACLA sent Plaintiff via email a form to approve an interim 30-day voucher extension, stating to Plaintiff the reason for the interim 30-day approval: *"The system is currently down and HACLA IT department is working diligently to get to the point of full restoration of services as quickly as possible. Once we have full access to the system, the reasonable accommodation request will be reviewed…"* Plaintiff had requested a 12-month extension of the housing voucher in order to recapture the time lost due to the actions of the above-mentioned agencies.   On May 25, 2023, Plaintiff complied with the HACLA request to sign and return the form for an interim 30-day voucher extension.

Paragraph 8

On June 23, 2023, Plaintiff followed up with HACLA to inquire about the status of Plaintiff's extension request.  On the same day, a HACLA representative wrote to Plaintiff to say that there was no new information. Plaintiff contacted HACLA again on June 27, 2023 to inquire about the

status of Plaintiff's extension request. On June 28, 2023, a HACLA

representative responded to Plaintiff to say again that there was no new

information regarding Plaintiff's extension request.  As of this filing,

Plaintiff has heard nothing further from HACLA regarding Plaintiff's

request for a 12-month extension.

Paragraph 9

On June 21, 2023, Plaintiff sent correspondence via USPS Registered Mail

to LAHSA CEO Dr. Va Lecia Adams Kellum in order to get assistance with

all matters concerning the problems that Plaintiff has incurred with LAHSA

and its services providers while Plaintiff is trying to secure permanent

housing.  Plaintiff received USPS confirmation that Dr. Adams Kellum

received Plaintiff's correspondence on June 26, 2023.

Paragraph 10

Plaintiff is concerned about the timeliness of a HACLA response to

Plaintiff's request for special accommodation before Plaintiff's housing

voucher expires on July 2, 2023, which falls on a Sunday. A prior request for

special accommodation was submitted by Plaintiff asking that any

permanent housing comply with ADA requirements, including a functioning

elevator. The request was made on or about April 4, 2022.  HACLA denied

the request and informed Plaintiff of its determination on or about December

15, 2022, some eight months after Plaintiff made the request.

Paragraph 11

On June 12, 2023, Plaintiff was enrolled in the Inside Safe Program launched

by the City of Los Angeles and administered by LAHSA.  The City/LAHSA

contracted Weingart Center to operate the program.  Weingart Center began

its official start date on June 15, 2023.  As of this filing, Plaintiff has not had

benefit of reviewing housing needs with a case manager from Weingart

Center.

Paragraph 12

On or about January 13, 2023, Plaintiff reported to HUD the multiple

problems he had experienced in securing services to acquire permanent

housing.  Plaintiff chronicled these events to HUD through support

documentation, emails, and telephone conference call. Plaintiff chronology

included relevant dates, names, places and events.

On April 24, 2023, Plaintiff reported to HUD that on Tuesday, March 7, 2023, a TSA staffer, accompanied by another staffer, came to Plaintiff's room door at about 5pm and said that he had "good news." The TSA staffer said that he had a "proposal" on how to get Plaintiff into permanent housing. The TSA staffer then handed Plaintiff a memo. Plaintiff told the TSA staffer that Plaintiff was instructed by HUD not to move forward on anything until further instruction from HUD. The TSA staffer became animated, telling Plaintiff that the memo represented HUD and LAHSA.

Paragraph 13

Plaintiff reported to HUD that the March 7th memo does not identify the author, is not signed and is not printed on any letterhead. The memo also did not provide an accurate account of a documented timeline of all that had transpired to date, including the information in Plaintiff's original correspondence to HUD dated 1/13/23 and to which HUD forwarded a letter to Plaintiff acknowledging that correspondence on 2/27/23.

Paragraph 14

Plaintiff reported to HUD that Plaintiff told the TSA staffer that instructions from HUD are not to move forward until Plaintiff receives further

instruction from the HUD office. The TSA staffer said that he would return

on Friday (3/10/23) and that Plaintiff needed to be prepared to talk about the

notice and that the TSA Program Director (Stacie Washington) wanted

Plaintiff's input. The TSA staffer then left. The TSA staffer never returned.

Paragraph 15

Plaintiff reported to HUD that due to Plaintiff's medical challenges, Plaintiff

discussed the matter with his physicians because it negatively impacted

Plaintiff's health.  Following his doctors' appointments in May 2023,

Plaintiff asked his physicians to forward correspondence to HUD officials.

The physician letters recapped prior correspondence to LAHSA and TSA

that both agencies repeatedly ignored and provided an update on Plaintiff's

current health status. The letters also underscored why stressful episodes of

this type negatively impact Plaintiff's health.

Paragraph 16

In response to a HUD inquiry, Plaintiff's physician letters also addressed

why transferring to another temporary housing site is not plausible for him.

Plaintiff's current location is safe and is in proximity to the health facilities

that he utilizes. Accordingly, Plaintiff made it known to HUD that he wanted

to remain at his current interim housing site and make an orderly transfer to permanent housing.

Paragraph 17

Plaintiff reported to HUD that on December 2, 2022, there was a federal filing made on Plaintiff's behalf by an attorney to halt a scheduled 12/5/22 exit date from Plaintiff's current interim housing site. Documentation shows that the filing was done after all attempts by Plaintiff to reach out to LAHSA/TSA failed to accomplish anything. TSA Program Director Stacie Washington came to Plaintiff's room on 12/5/22 prepared to exit Plaintiff and his wife. Plaintiff showed Ms. Washington a copy of the court filing.  Ms. Washington requested a copy which was provided.

Paragraph 18

Plaintiff's earliest communication with the attorney commenced on or about November 9, 2022 and continued through January 17, 2023 and included emails, texts and telephone calls.  From the onset, Plaintiff asked attorney whether there would be any conflict of interest since Plaintiff's issues were with agencies affiliated with the city and county.  Plaintiff was aware through reading the attorney's biographical information and an article in the

Los Angeles Times that the attorney had received political endorsements from Mayor Karen Bass and County Supervisor Holly Mitchell.  The attorney told the Plaintiff that no conflicts of interests existed.  The attorney proceeded with a filing in court on 12/2/22. The attorney did not use all of the information the Plaintiff had provided, in particular, information that Plaintiff had disclosed about developer Dan Gilbert's adverse actions against Plaintiff.  Gilbert is founder/owner of Quicken Loans/Rocket Mortgage, the majority owner of the NBA Cleveland Cavaliers and is a corporate sponsor of a nationwide, nonprofit housing program known as BUILT FOR ZERO. Gilbert has business interests in all 50 states.

Paragraph 19

On January 17, 2023, the attorney failed to respond to communication from Plaintiff regarding a second filing to address the interruption of Plaintiff's housing paperwork by LAHSA service provider PATH that occurred on December 30, 2022.  Plaintiff and attorney discussed this second filing on January 14, 2023 after Plaintiff sent attorney multiple emails alerting the attorney to housing paperwork interruption and delay.

The attorney told the plaintiff that the second filing could be submitted to the Court on Tuesday, January 17, 2023.   The attorney never submitted the second filing and Plaintiff never heard from this attorney again.

Paragraph 20

When Plaintiff spoke with the attorney on 11/17/22, the attorney asked to whom he should send notice of the intent to file. Plaintiff told the attorney that notice should likely go to LAHSA Interim Executive Director Stephen Simon. Plaintiff requested that the attorney send the notice to Simon on 11/17/22.  On 11/27/22, Plaintiff contacted the attorney and asked whether he had sent notice to Simon and whether he had filed in court. The attorney sent Plaintiff a copy of an email that he forwarded to Simon on 11/23/22, six days after the 11/17/22 discussion Plaintiff had with the attorney. At this point, the attorney had not filed in court. The filing was not submitted until 12/2/22.

Paragraph 21

On 12/2/22, Plaintiff spoke with the attorney and asked whether the attorney had heard anything from the opposing counsel. (LAHSA Deputy Chief Counsel Aleen Langton and later referred to outside counsel Vanessa A.

Evangelista.) The attorney told Plaintiff that he had not and that the opposing counsel had 24 hours to respond.  The attorney told Plaintiff that he was waiting on the Court to let him know if a hearing would be granted.

Paragraph 22

On the same day, Plaintiff received an email from the attorney that was forwarded from the Court regarding the attorney's motion filing for an ex parte temporary restraining order. This was the first communication from the attorney confirming exactly what was filed.  At this point, the attorney had still not discussed this filing with Plaintiff.  Per an email from the Court, this was also the first time that Plaintiff learned that a hearing is rarely granted for an ex parte temporary restraining order.  Plaintiff had provided the attorney with approximately 100 pages of documentation, including information that had already been submitted to members of Congress and others regarding developer Dan Gilbert and his adverse actions towards Plaintiff.

Paragraph 23

The attorney did not submit any of the information regarding Gilbert to the Court.

The Complaint, Request for Injunction and the Application for an Ex Parte Temporary Restraining Order were withdrawn as a condition of an agreement the attorney said he reached with the County of Los Angeles and LAHSA.  Plaintiff expected to receive an official agreement requiring Plaintiff's signature by the Court.  Instead, on 12/5/22, the attorney sent a copy of an email from the attorney representing the County of Los Angeles and LAHSA, which in effect cleared the County of Los Angeles and LAHSA of violating Plaintiff's civil rights in exchange for allowing Plaintiff to remain at the interim housing site until at least January 19, 2023.  When Plaintiff asked the attorney whether there was a written agreement for Plaintiff to sign, the attorney said, "You got the house, don't you?" The attorney then told Plaintiff that all Plaintiff had to do was to speak to Stacie Washington of TSA or Kyra Price of LAHSA.

Paragraph 24

The unofficial agreement reads as follows: "*LAHSA is agreeable to extending Mr. Gray's stay at the LA Grand until 1/19/23 on the condition that (1) he agrees and confirms that no additional extensions will be provided and (2) agrees and confirms that he has another emergency shelter or housing of his own choosing when he*

*leaves the LA Grant on 1/19.  He can speak to Stacy Washington or Kyra Price.  Please let me know if Mr. Gray is agreeable to this and if you intend to withdraw your ex parte.  If not, I will file an opposition to the ex parte today."*  Plaintiff's civil rights were violated under the terms of this agreement.

Paragraph 25

Prior to filing, the attorney did not discuss with Plaintiff most of the paperwork that Plaintiff forwarded to him (sent via email on 11/15/22, 11/16/22, 11/17/22, 11/18/22) or Plaintiff's request to file an emergency injunction.  Subsequent to the filing, Plaintiff sent the attorney information on 12/12/22 for which the attorney did not follow up for discussion. Plaintiff also sent the attorney information on 1/11/23, 1/13/23 and 1/16/23 regarding the PATH supervisor's interference with the paperwork necessary for Plaintiff to move forward with securing permanent housing.

Paragraph 26

The agreement failed to protect Plaintiff from the interruption initiated by PATH that stalled Plaintiff's paperwork processing to secure permanent housing.  On 12/30/22, in the middle of Plaintiff completing permanent

housing paperwork, PATH Supervisor Stella Fonseca directed her

subordinate, PATH Housing Navigator Alden Harth, to halt the completion

of Plaintiff's housing navigation paperwork.


Paragraph 27

In Plaintiff's meeting on December 30, 2022 with Mr. Harth, it was mutually

agreed   that the PATH Information Disclosure Consent form does not

require Plaintiff to provide consent to authorize disclosure to any

person/agency that Plaintiff does not elect as a condition of receiving

housing services. HACLA, as the issuing agency for the emergency housing

voucher, cautioned Plaintiff (through its instructional package and videos)

not to sign anything under coercion and/or threat of not receiving housing

services. The paperwork interruption cost Plaintiff valuable time in working

to secure permanent housing.  Mr. Harth told Plaintiff that he could still file

a grievance regarding what occurred at LAX with PATH/Mr. Peoples.


Paragraph 28

Plaintiff sent the attorney additional information on 1/11/23, 1/13/23 and

1/16/23 regarding the PATH interruption of the paperwork necessary for

Plaintiff to move forward with securing permanent housing in advance of the

1/19/23 exit date. The attorney did not follow up.  Plaintiff also forwarded text messages on 1/12/23 (twice), 1/13/23, and 1/17/23 to try and communicate with the attorney.  On 1/17/23, Plaintiff called the attorney but could not leave a message because his voice mail was full so Plaintiff sent a text inquiring how the attorney intended to handle Plaintiff's matters described in Plaintiff's emails to the attorney, including the delays in Plaintiff's housing paperwork in light of the then 1/19/23 exit date Plaintiff faced.

Paragraph 29

On 1/14/23, Plaintiff had the chance to speak with the attorney and asked how he intended to proceed.  The attorney told Plaintiff that he had not had a chance to review the additional information Plaintiff had forwarded, that the Court was closed on the following Monday (1/16/23) due to the MLK federal holiday and that the earliest he could file anything would be on Tuesday, 1/17/23.  Only about ten percent of the material Plaintiff forwarded to the attorney was new information since Plaintiff had already sent the attorney documentation previous to the 12/2/22 filing.  Plaintiff's wife told the attorney about an Adult Protective Services report filing.  Plaintiff never heard from this attorney again after this conversation.

Paragraph 30

On 1/18/23 a new attorney got involved.  The new attorney asked if Plaintiff

minded whether he called PATH.  Plaintiff told the attorney that he did not

mind.  The new attorney asked if Plaintiff minded him calling PATH's

Alden Harth and again, Plaintiff told him that he did not mind.  Mr. Harth is

the PATH housing navigator who had been working with Plaintiff until

12/30/22 to complete housing paperwork. The attorney would eventually

contact Harth's supervisor, Stella Fonseca of PATH.


Paragraph 31

After the attorney's phone call to Ms. Fonseca, the attorney asked Plaintiff

to contact her.  On 1/18/23, Plaintiff did contact Ms. Fonseca.  Following her

conversation with the attorney and with Plaintiff, Ms. Fonseca confirmed by

phone and email that the 1/19/23 exit date had been cancelled because

she/PATH went to LAHSA and LAHSA halted the exit.  She also told

Plaintiff that PATH was waiting on further instructions from LAHSA on

how to proceed.  On 1/19/23, when TSA Program Director Stacie

Washington came to Plaintiff's room to execute an exit, Plaintiff showed

Ms. Washington the PATH correspondence confirming that the exit date had been halted.

Paragraph 32

Plaintiff did not get any information from Ms. Fonseca on LAHSA's instructions to her about how LAHSA wanted PATH to proceed until March 3, 2023 when Ms. Fonseca wrote to Plaintiff in an email that reads as follows: *"Please see attached which is the guidance we received from LAHSA. It says domestic violence which is not your situation, but it is the guidance for moving forward with clients that have good reason not to share their information with LAHSA. We believe in your case there is good reason therefore we will proceed with this route in order to protect your information. Please let me know when a good date and time is to schedule our meeting at 340 N. Madison Ave. Los Angeles CA 90004. "*


Paragraph 33

Plaintiff reported to HUD that Plaintiff had not responded to this approach offered by LAHSA/PATH because Plaintiff considered the suggested approach to lack integrity.  Plaintiff reported to HUD PATH's rejection (via Ms. Fonseca) of the use of DOCU-SIGN which Plaintiff intended to use to protect the integrity of the paperwork process.   In addition to the PATH

email(s), there were two handwritten notes from a PATH representative left on Plaintiff's door, the latest of which was left on 4/14/23 inquiring about whether (or not) Plaintiff intended to participate with PATH. Plaintiff informed PATH via email that he was instructed by HUD to wait for further instructions on how to proceed.

Paragraph 34

Plaintiff reported to HUD that preceding the federal court filing, Plaintiff communicated with multiple offices and agencies seeking help. Among them was the office of Councilmember Kevin de Leon because his district includes Plaintiff's current interim housing site.   On 11/28/22, Plaintiff responded to an email from a de Leon staffer (Mathew Tenchavez) who said he had contacted TSA Program Director Stacie Washington and that Ms. Washington had (erroneously) reported that Plaintiff had no emergency housing voucher and had not engaged in any housing program services.

Paragraph 35

Plaintiff reported to HUD that he made a similar request for assistance to the Los Angeles County Board of Supervisors to the office of then-Chairwoman Holly Mitchell which reported back (via Lily Sofiani/Sally Malone) with

options that were not viable alternatives such as a hybrid shelter environment and what was described as a health bed.  Plaintiff provided the office with copies of the medical letters detailing his challenges and that LAHSA/TSA had ignored.

Paragraph 36

During Plaintiff's February conference call with HUD, HUD officials mentioned a Tiara Clark of LAHSA. Plaintiff reported to HUD officials that Ms. Clark was an integral part of the conversation surrounding the grievance Plaintiff filed, which ultimately resulted in a letter of rejection dated 11/30/22 and designating the Beacon Motel as an alternative site for Plaintiff and his wife. Photos of the Beacon Motel show an exterior in disrepair and a surrounding environment that is unsafe.  Plaintiff also received an email from a TSA staffer who admittedly could not provide Plaintiff with the name of the operating agency for this site.  Plaintiff later found out that the site's telephone number was disconnected. As a result of Plaintiff's due diligence regarding this site, Plaintiff advised LAHSA/TSA of his findings and that Plaintiff could not accept transfer to the Beacon.

Paragraph 37

Plaintiff reported to HUD that between August 25, 2022 through October 6, 2022 Plaintiff asked that his proposed exit date (December 5, 2022) from the interim housing site be amended for no sooner than January 19, 2023.  In support of this extension request, Plaintiff provided medical documentation and notified LAHSA/TSA of the existence of the same.  Plaintiff provided copies of those letters to HUD.

Paragraph 35

Plaintiff reported to HUD that the initial physician's letters were retrieved at the instruction of a TSA employee (Terriann Butler) serving as Plaintiff's service coordinator who was later discharged from her job.  Ms. Butler specifically told the Plaintiff that retrieval of the physician's letters would secure Plaintiff's requested extension.

Paragraph 38

After Ms. Butler's discharge, no one from LAHSA/TSA followed through on these instructions to Plaintiff.  Plaintiff was not informed of this service coordinator's firing until some two weeks after the employee's firing on or about September 16, 2022.  Plaintiff was notified that his service coordinator

was no longer an employee on September 30, 2022, marking 35 days since Plaintiff's initial request for an extension.

Paragraph 39

Plaintiff filed a formal grievance with LAHSA on 9/26/22 regarding Plaintiff's request for an amended exit date.  The grievance was accompanied by physician letters attesting to Plaintiff's medical challenges. LAHSA never contacted Plaintiff's physicians and rejected Plaintiff's extension request on or about 10/5/22.

Paragraph 40

On October 3, 2022, two days prior to Plaintiff receiving notice from LAHSA that Plaintiff's grievance had been rejected, TSA Program Director Stacie Washington came to Plaintiff's room to inform Plaintiff that there would be no extension. Plaintiff had just received an email from LAHSA that day stating that the matter was still under review.  Ms. Washington further stated that LAHSA could send a doctor and that "they could be rough" and could force Plaintiff into a nursing home.  Plaintiff told Ms. Washington that he stood by all that had been articulated in the emails forwarded to TSA and LAHSA, including Plaintiff's physician's letters.

Paragraph 41

Plaintiff filed a second grievance on or about 11/15/22 with LAHSA to request an extension and to request that LAHSA acknowledge Plaintiff's medical documentation.  On 11/30/22, LAHSA notified Plaintiff that the second grievance was also rejected.  The LAHSA rejection notice came two business days prior to the scheduled 12/5/22 exit date.

Paragraph 42

After Plaintiff received Notice to Exit on August 25th, Plaintiff's former TSA services coordinator, Ms. Terriann Butler, told Plaintiff (right before Ms. Butler was discharged) that it was critically important for Program Director Stacie Washington to respond to the inquiries for assistance or it would appear that Plaintiff was never registered as a client and that the events had never happened. Many of the emails that Plaintiff sent to Ms. Washington went unanswered, among them one regarding Plaintiff's COVID vaccination card missing from Plaintiff's room and a TSA Staffer (Eli Flores) giving Plaintiff confusing information about a phone call from

Kentucky purportedly for housing services for which Plaintiff never received any follow up.

Paragraph 43

A new TSA service coordinator, Corvetta Morris, was assigned to Plaintiff on or about November 7, 2022.  Ms. Morris asked Plaintiff what ADA requirements Plaintiff might need in permanent housing.  On November 8, 2022, Plaintiff provided Ms. Morris via email with medical documentation regarding Plaintiff's health challenges.  Later that day, copies of the physician letters that Plaintiff sent to service provider TSA (and that Plaintiff also sent to LAHSA) were personally returned to Plaintiff by Ms. Washington, who was accompanied by Ms. Morris.

Paragraph 44

Plaintiff forwarded the correspondence to the TSA headquarters in Carson to ensure that the physician letters documenting Plaintiff's health challenges were on file.  As former TSA staffer Terriann Butler predicted, a pattern of failing to acknowledge Plaintiff's requests for medical assistance continued through at least 12/17/22.  Plaintiff discovered that as late as 12/17/22 that none of his medical information had been recorded despite the multiple

physician letters that Plaintiff had provided.  The omission was confirmed by the charge nurse on duty on 12/17/22.  A report was filed with Adult Protective Services on 12/30/22.

Paragraph 45

In February 2022, Plaintiff and his wife were enrolled by telephone in the HMIS by a LAHSA staffer, Carmen Jimenez.  This happened after Plaintiff spent five weeks at an outpatient rehabilitation center following Plaintiff's week-long hospitalization at UCLA Reagan Medical Center for stroke symptoms and a fall at LAX that occurred the last week of January 2022.

Paragraph 46

Approximately ten days prior to Plaintiff's fall at LAX, Plaintiff was refused emergency housing services by LAHSA funded service provider PATH and its representative, Tabari Peoples.  Plaintiff was referred to Peoples/PATH by a Southwest ticket counter agent.  The agent gave Plaintiff a PATH business card. That agent also made contact with Peoples on Plaintiff's behalf.  Peoples took pictures of Plaintiff's and wife's U.S. passports and left Plaintiff with the promise that he would soon provide information on where PATH would place Plaintiff and his wife.  Plaintiff kept photos of telephone records of contact with Peoples/PATH. Plaintiff shared with Peoples

correspondence that documented how Dan Gilbert interfered with Plaintiff's work on a project on the murder of George Floyd, including special accommodations in Minneapolis afforded to Plaintiff because of Plaintiff's medical challenges.  Plaintiff's documentation described how Gilbert, through Minneapolis Mayor Jacob Frey's office, disrupted the special accommodations afforded to Plaintiff and disrupted Plaintiff's work on the Floyd project, including circumventing contact Plaintiff had made with the offices of Apple CEO Tim Cook, New England Patriots owner Robert Kraft and others who had expressed interest in supporting programs following Mr. Floyd's murder. This is the same type of disruption that Gilbert has enacted against Plaintiff in Los Angeles.  Plaintiff subsequently learned that the former CEO of LAHSA, whose sister worked with the Minneapolis Police Department, was communicating with the department to get information on the Floyd murder in order to shape a platform.  Plaintiff met with former Minneapolis Chief Medaria Arradondo, who spent a great deal of time with Plaintiff concerning Plaintiff's project on George Floyd.  Chief Arradondo told Plaintiff that the mayor was not going to do anything to support Plaintiff's project.

Paragraph 47

Prior to Plaintiff's hospitalization at UCLA Ronald Reagan Medical Center on Tuesday, January 25, 2022, on Monday, January 24th, Plaintiff's wife began experiencing chest pains. Plaintiff accompanied wife to The Ronald Reagan UCLA Medical Center where she was kept for observation while tests were run to ensure that she hadn't suffered a heart attack. Upon Plaintiff's wife's discharge, Plaintiff took her to the hospital cafeteria to have breakfast. Plaintiff spent the remainder of the day (roughly 11 am to 3 pm) in the quiet area of the cafeteria where others were working/studying because Plaintiff's wife had to prepare for a class later that evening. Plaintiff stepped outside momentarily to take a picture of the building and grounds. All of a sudden, a man came up behind Plaintiff in a stealth-like walk. When Plaintiff turned around, the man jumped back and retreated to the rear of the cafeteria in the open courtyard. The man's behavior was peculiar because he kept watching Plaintiff as Plaintiff would move from the table where Plaintiff's wife was seated and go outside to get some air. Because of the way the man had originally approached me, Plaintiff recorded these instances on Plaintiff tablet. Plaintiff also noted the security cameras outside the perimeter of the building, which would have documented the same events.

Paragraph 48

Later that evening, while Plaintiff was in a waiting area with Plaintiff's wife as she was preparing to go to class, Plaintiff observed a group of between 25 to 30 people that Plaintiff had seen in the hospital cafeteria. Plaintiff noticed that a number of these three individuals from that group approached and sat about ten feet behind Plaintiff and his wife.  Plaintiff wife's back was turned away from this group as they were facing the Plaintiff. They began circling Plaintiff and as they did, Plaintiff again pulled out his tablet to record the events.

Paragraph 49

As Plaintiff documented these individuals' aggressive behavior, they immediately retreated, dispersing to other areas of the waiting room lobby area. Plaintiff kept a record of these events per time-dated notes and time-stamped video.  Hospital cameras were also in the area. The stress of these events aggravated symptoms that Plaintiff suffered as a result of a fall Plaintiff had at LAX.  The fall was similar to one Plaintiff had suffered six months prior and for which Plaintiff had also been hospitalized. In both instances, the falls were tied to Plaintiff's medical history as a post-

stroke/heart patient and diabetic. For these reasons, Plaintiff also visited the emergency room. Plaintiff was transferred for admission to UCLA Medical Center in Santa Monica, an acute care facility.  Plaintiff's medical challenges are directly tied to the stress that Plaintiff suffered as a result of Gilbert and his cohorts interfering in Plaintiff's business and personal affairs over a 20-year period.  Plaintiff suffered hardships on both a personal and business level, losing his home, professional relationships and business opportunities to generate income.  Plaintiff filed police reports on attempted deadly assaults against Plaintiff that Plaintiff believes were tied to Gilbert. Plaintiff spoke about these matters in a bankruptcy hearing but before Plaintiff could finish his statement, a federal judge interrupted Plaintiff's testimony.

Paragraph 50

The day before Plaintiff's discharge, a senior physical therapist recommended no less than 30 days of physical therapy that was supposed to commence in the hospital. Plaintiff only had the benefit of a single session—and that was with the senior physical therapist who performed an assessment. Plaintiff's hospital discharge was contentious at best. After much pushback, the hospital finally relented and made the effort to locate an

outpatient facility for Plaintiff and that was supposed to be able to accommodate Plaintiff's outpatient healthcare. This was confirmed by a hospital staff member who visited Plaintiff's room on the day of Plaintiff's discharge. However, while Plaintiff's wife was sitting in a lobby near the nurse's station, she heard members of the hospital staff making disparaging remarks about Plaintiff's refusal to be transferred to any facility where Plaintiff's wife could not be present. The hospital staff members were preparing themselves to enter Plaintiff's room preceding Plaintiff's discharge. As the group got up and began to go to Plaintiff's room, Plaintiff's wife followed behind them. It wasn't until Plaintiff's wife entered the room that the group understood who she was. As the leader of this hospital team began to speak about where and when Plaintiff would be discharged, Plaintiff's wife interjected, informing the lead member heading the discharge meeting, that she and her team were in direct contradiction with what had already been arranged for Plaintiff. The staff members and team leader had failed to check Plaintiff's chart for the updated information. After a contentious back and forth, Plaintiff pointed out that he had documented his therapy session to accurately recall the exercises, treatment plan, etc.  Plaintiff's wife invited the hospital team leader to review the information, which confirmed for all present what the therapist had

recommended for Plaintiff's treatment plan. The hospital team never

recorded its session in Plaintiff's health chart. Plaintiff's primary physician

recommended that Plaintiff report the team's actions, which Plaintiff did.

Paragraph 51

On or about March 4, 2022, Plaintiff and his wife were sent to an interim

housing site in Lancaster contracted by LAHSA. Plaintiff's room was

infested with roaches.  Ms. Jimenez requests that Plaintiff take pictures and

forward them to her/LAHSA.  Ms. Jimenez told Plaintiff that he will need to

spend nine days at the site in Lancaster.  LAHSA kept Plaintiff at the

Lancaster site for an additional two days before being transferred to a site in

Los Angeles.

Paragraph 52

On or about March 14, 2022, LAHSA transferred Plaintiff and his wife to

the Best Western in Chinatown, Los Angeles. LAHSA contractor FIRST TO

SERVE operated the site. Upon arrival and intake, Plaintiff was immediately

told that he would not have a case manager because of the site's case

overload.  Plaintiff completed paperwork presented by LAHSA to receive an

emergency housing voucher.

Paragraph 53

On or about April 4, 2022, LAHSA requested that Plaintiff fill out another

set of forms, this time from HACLA, to receive an emergency housing

voucher.  Plaintiff complied with the request and also submitted the

necessary support documentation via email.  Plaintiff was informed that he

would be notified should any additional support documentation be required.

A few days following April 4, 2022, on the date of a scheduled meeting with

an onsite LAHSA Staff member, the staff member told Plaintiff that she did

not have any of Plaintiff's paperwork and didn't know where the paperwork

was located.

Paragraph 54

On or about May 16, 2022, Plaintiff received an email from HACLA

intended for another client regarding approval of that client's emergency

housing voucher.  Upon further investigation, Plaintiff learned from a

HACLA representative that HACLA had been trying to reach Plaintiff but

was not successful because neither LAHSA nor FIRST TO SERVE had

provided HACLA with the correct contact information.

Paragraph 55

Emails sent from HACLA to LAHSA and FIRST TO SERVE

representatives document the attempts by HACLA to reach both LAHSA

and FIRST TO SERVE for additional Plaintiff information needed to

complete the HACLA process for an emergency housing voucher. In a May

18, 2022 email, HACLA had imposed a deadline of May 30, 2022 for

FIRST TO SERVE/LAHSA to respond to HACLA or HACLA would

withdraw Plaintiff's application for an emergency housing voucher.

Plaintiff learned what information was required by contacting HACLA

directly and by providing HACLA all of the information necessary for the

voucher.  Voucher was approved on or about June 2, 2022.

Paragraph 56

FIRST TO SERVE issued a Notice to Exit on May 17, 2022 advising that

the site would be closing on June 15, 2022 and Plaintiff would be offered a

shelter on Skid Row.  FIRST TO SERVE gave Plaintiff a flyer about a pop-

up housing event hosted by (former) Mayor Garcetti and represented that the

mayor's office had invited Plaintiff to attend.  Plaintiff changed a physician

appointment to attend this event.  However, when Plaintiff arrived to the

area where the event was scheduled to occur, Plaintiff was informed by

FIRST TO SERVE that the event was cancelled.  At this point, Plaintiff still had no information on either a case worker or housing options.

Paragraph 57

On June 8, 2022, a Los Angeles County nurse visited the FIRST TO SERVE site to administer onsite COVID tests.  The nurse confirmed that neither Plaintiff nor his wife are medically eligible for a shelter environment. Plaintiff informed FIRST to SERVE of this information and requested transfer to the interim housing site known as the LA GRAND.  Plaintiff learned from a FIRST TO SERVE representative that LAHSA staff had determined not to transfer Plaintiff to the LA GRAND.  However, after the Los Angeles County nurse visited, Plaintiff was transferred to LA GRAND on June 9, 2022.

Paragraph 58

On or about June 23, 2022, following Plaintiff's transfer to the LA Grand interim housing site, Plaintiff was assigned a TSA services coordinator, Eli Flores, who told Plaintiff on that day about a phone message he received from a person named Ms. Fein (sp?) regarding housing program services.  Mr. Flores provided a telephone number with an area code from Kentucky.  Mr.

Flores could not provide a first name and said only that the person

represented PATH.  Plaintiff immediately called the number with Mr. Flores

still present.  There was no name and no message greeting when Plaintiff

called the phone number.  Plaintiff left a message and requested that Mr.

Flores leave a message as well. Plaintiff told Mr. Flores that he had some

concerns about someone contacting Plaintiff with no verifiable information

that the contact was legitimate. Plaintiff asked Mr. Flores if he was aware of

the documentation process that Plaintiff had already completed.  Mr. Flores

told Plaintiff that he did not have the information.

Paragraph 59

On June 27, 2022, Plaintiff sent an email to Mr. Flores to further inquire

about the housing services that were to be provided by Ms. Fein through

PATH.  Mr. Flores responded that Plaintiff had been assigned a new TSA

services coordinator, Ms. Terriann Butler.  (July 26, 2022 was Plaintiff's

first encounter with Mr. Butler, who informed Plaintiff that her caseload was

very large because she was handling clients on two floors of the building.)

After this email, Plaintiff never heard from either Mr. Flores or Ms. Fein

again.

Paragraph 60

On June 30, 2022, Plaintiff received an email from a Van Ngo representing PATH.  Mr. Ngo wrote to Plaintiff that there were documents missing from Plaintiff's application for housing services.  Plaintiff responded via email informing Mr. Ngo that no application had been submitted to PATH for housing services, that someone named Ms. Fein had contacted Mr. Flores of TSA and, in turn, Plaintiff had contacted Ms. Fein but never heard from her. Plaintiff inquired about how Mr. Ngo received Plaintiff's contact information and asked for clarity on Mr. Ngo's purpose for contact.  Plaintiff never heard from Mr. Ngo again.

Paragraph 61

Plaintiff's first interaction with PATH occurred between January 7, 2022 and January 12, 2022 when a PATH representative named Tabari Peoples pledged but failed to assist Plaintiff in the securement of emergency interim housing despite Plaintiff providing documentation of Plaintiff's medical challenges as a post-stroke/heart patient with diabetes.  Plaintiff chronicled the events that occurred during this encounter in an email dated December 1, 2022 and addressed to PATH housing navigator Alden Harth.  Following the January 2022 initial encounter with PATH wherein Plaintiff failed to receive

any assistance from PATH, Plaintiff was hospitalized at UCLA Ronald

Reagan Medical center after suffering a fall associated with symptoms of a

stroke. Plaintiff had suffered a similar fall in 2021 for which Plaintiff had

been hospitalized.

Paragraph 62

Plaintiff spent a week (January 25 through January 30, 2022) at UCLA

Medical Center, then another five weeks (January 30th through March 4,

2022) in an outpatient rehabilitation facility called CRC/HOLA located in

Palmdale. Plaintiff reported incidents of what Plaintiff considered to be

unprofessional conduct and mistreatment at the hospital and at the

rehabilitation facility (including threats of patient dumping) to the State of

California via the Governor's Office, Secretary of State, State Attorney

General, Area Agency on Aging and Adult Protective Services.

Paragraph 63

On or about March 1, 2022 and on or about March 4, 2022, a representative

from Los Angeles County Adult Protective Services named Chester Guerro

visited Plaintiff while at the rehabilitation facility. Mr. Guerro took down a report, took pictures of Plaintiff's documentation and medications. Plaintiff also shared correspondence regarding developer Dan Gilbert and his adverse actions against Plaintiff.  Mr. Guerro took photographs of the correspondence.  Mr. Guerro told Plaintiff that he would be filing a recommendation for an investigation by the Los Angeles County Department of Consumer and Business Affairs.

Paragraph 64

Mr. Guerro subsequently told Plaintiff that the recommendation would go to his supervisor.  On or about April 13, 2022, Plaintiff contacted Mr. Guerro by telephone to receive an update on the report to Adult Protective Services. Mr. Guerro told Plaintiff that the report had been turned over to Tim Flores of Adult Protective Services and that Mr. Flores could take as much time as he wanted to conduct and complete the investigation.  Mr. Guerro also informed Plaintiff that an investigator from the Los Angeles County Department of Consumer and Business Affairs had been assigned to address Plaintiff's concerns.  Between May 2, 2022 and May 9, 2022, Plaintiff made several attempts to speak directly with Mr. Flores but was not successful. Mr. Flores never provided Plaintiff with any information on Plaintiff's concerns.

Paragraph 65

On or about June 29, 2022, Plaintiff was contacted by Nazeli Shakhbazyan, an Investigator from the Los Angeles County Department of Consumer and Business Affairs that was assigned to address Plaintiff's concerns.  Ms. Shakhbazyan requested documentation from Plaintiff.  Plaintiff advised Ms. Shakhbazyan that he had provided all documentation requested to Mr. Guerro during Mr. Guerro's meetings with Plaintiff in March 2022.   Ms. Shakhbazyan responded to plaintiff that once she received the documentation from Mr. Guerro, she would follow up with Plaintiff via telephone.

Paragraph 66

In Plaintiff's February conference call with HUD, Plaintiff reported to HUD officials that Plaintiff believed his efforts to succeed in acquiring permanent housing were being roadblocked by developer Dan Gilbert.  Following the conference call, Plaintiff provided HUD officials with documentation in this regard.  During the conference call, Plaintiff told Mr. Rufus Washington and Mr. Nathaniel King of HUD how Gilbert had bulldozed

a major development project spearheaded by Plaintiff and funded in part by

HUD dollars, how Gilbert defied a court order issued by a judge (who is

now a federal court judge) that granted Plaintiff the right to complete the

development project and how Gilbert repeatedly interfered in other projects

launched by Plaintiff.  During the conference call, Mr. Washington told

Plaintiff that HUD would not be investigating any of these matters. Plaintiff

made HUD officials aware that Gilbert is founder/owner of Quicken

Loans/Rocket Mortgage, the NBA Cleveland Cavaliers and is a corporate

sponsor of a nationwide, nonprofit housing program known as BUILT FOR

ZERO.  Gilbert has business interests in all 50 states. Prior to Plaintiff's

communication with HUD, Plaintiff sought help from all members of Los

Angeles City Council regarding Plaintiff's myriad of problems with

LAHSA/TSA program services and included information about the adverse

actions of Dan Gilbert toward Plaintiff.  Plaintiff also informed the Los

Angeles Mayor's Office of the same.

Paragraph 67

Beginning July 2018, Plaintiff corresponded with NBA Commissioner

Adam Silver as well as members of the NBA Board of Governors and the

Board of Directors for the NBAPA, the latter representing NBA players.

Plaintiff's sent Commissioner Silver roughly 50 pages of documentation. Commissioner Silver's office responded via a letter dated October 23, 2018. Plaintiff then received an email on December 28, 2018 from Pat Ruel, an assistant to Joe Maczko, NBA Vice President and General Counsel, requesting on behalf of Mr. Maczko that Plaintiff send a second copy of Plaintiff's additional correspondence to Commissioner Silver dated November 19, 2018. Plaintiff complied with the request. Ms. Ruel told Plaintiff that he should expect follow up but no follow up occurred.

Paragraph 68

Plaintiff's correspondence to NBA Commissioner Silver was based upon the precedent that the NBA set in the cases of two other NBA franchises (Los Angeles Clippers and Dallas Mavericks) investigated for discriminatory and other corrosive practices. The NBA had also recently disciplined Robert Sarver, majority owner of the NBA's Phoenix Suns and WNBA's Phoenix Mercury franchises following its investigation of reported acts of racial discrimination and misogyny practiced by Sarver. Plaintiff wrote to Commissioner Silver, in part, that: *"As assuredly as the matters surrounding former NBA Los Angeles Clippers owner Donald T. Sterling and, more recently, those surrounding Dallas Mavericks owner Mark Cuban, were both deserving of the full attention of the NBA's Board of*

*Governors, so too, are the matters I disclosed to you in my documentation*

*concerning Dan Gilbert. Moreover, in the case of both team owners, the*

*League initially found out about the corrosive behaviors surrounding those*

*franchises through either media coverage or from a third party. In my case,*

*I have made the effort to contact your office for what I consider to be equally*

*caustic actions on the part of Gilbert."*

Paragraph 69

In July 2019, Plaintiff made an official report in Washington, D.C. of how

Gilbert and his associates derailed the completion of a major development

project financed with public and private dollars that Plaintiff spearheaded to

house programs servicing children and families. Gilbert used a more than

$700,000 contribution to the Trump Inaugural to curry favor in acquiring

Opportunity Zone status and more than $1 billion in tax benefits for the

same tract in which Plaintiff's development project was located before

Gilbert bulldozed it down.  Gilbert's act defied a court order giving Plaintiff

the right to complete the development project.  That order was issued by a

local judge who was later appointed to the federal bench by former President

Barack Obama.  Gilbert acquired full control of the land tract in which

Plaintiff's development project was housed through bankruptcy. Plaintiff hired a bankruptcy attorney to handle negotiations for the completion of Plaintiff's project. Following his research, the bankruptcy attorney told Plaintiff that he could find nothing in the bankruptcy paperwork that confirmed that Plaintiff's contract had been properly documented. The attorney further advised that Plaintiff was legally still in possession of the project site and instructed Plaintiff to install proprietary materials to document this fact. Plaintiff followed the instructions by installing a wall-sized banner with Plaintiff's corporate logo, visible from the street-side window. The bankruptcy attorney resumed negotiations with Gilbert and his associates. The first meeting involved an attorney (representing Gilbert and his associates) with whom Plaintiff's counsel had gone to college. Plaintiff's attorney fully expected the process to run smoothly and to include a thorough review of the terms of Plaintiff's original development agreement including the matching construction funds due from Gilbert and his associates. However, Plaintiff's attorney told Plaintiff that in the middle of the meeting, one of Gilbert's cohorts barged in, demanding that the meeting stop. This marked another step by Gilbert and his associates to stop the completion of Plaintiff's development project.

Paragraph 70

Plaintiff corresponded with two White House Administrations (President Barack Obama and President Donald Trump) regarding the adverse actions of Gilbert against Plaintiff's development project.  Plaintiff also sent correspondence to a number of Senate and Congressional leaders regarding the development project and its programming, among them (the late) Senator John McCain, Senator Bernard Sanders and former House Speaker Nancy Pelosi.  In 2017, Plaintiff met with Congresswoman Debbie Dingell in her Washington, D.C., office to seek assistance for Plaintiff's development project and programming for which Congresswoman Dingell pledged to help but did not follow through.  Congresswoman Dingell was responsible for securing millions of dollars in federal funding to support Gilbert's business interests in a light rail transit system. Correspondence was exchanged with Dingell's office preceding and following the meeting and photographs were taken to document Plaintiff awarding Congresswoman Dingell with a commemorative plaque for her support of Plaintiff's Washington, D.C. project documenting the 50th anniversary of civil unrest in more than 100 cities across the United States.

Paragraph 71

Plaintiff traveled to Washington, D.C. in July of 2019 to make an official report regarding Gilbert's activities to several members of the U.S. Senate and the U.S. House of Representatives, including members of the California delegation; specifically, then-Senator Kamala Harris, Congresswoman Karen Bass, and Congresswoman Barbara Lee.

Plaintiff also met with representatives of Senator Richard Blumenthal and Congressman John Sarbanes.   Plaintiff also corresponded with former U.S. Attorney General Eric Holder.

Paragraph 72

In July 2019, Plaintiff also met with the office of the late Congressman Elijah Cummings, then Chairman of the U.S. House Committee on Oversight and Reform.  Congressman Cummings' office began the process of investigating Plaintiff's report about Gilbert.  Plaintiff submitted to Congressman Cummings' office documentation extracted from more than 500 pages of support materials, audio and videotapes in a meeting held in Congressman Cummings' Washington, D.C. office. In addition to his role as Chairman of the House Oversight and Reform Committee, Cummings was also a chief proponent of H.R.1, which sought to eradicate the use of dark

money to influence public policy. A representative from Congressman

Cummings' office had already begun processing paperwork to commence a

review of the matter before the Congressman's death in October 2019.

Plaintiff was advised by the Office of the Clerk for the U.S. House of

Representatives that Plaintiff's matter remained open.

Paragraph 73

Plaintiff learned that Gilbert interfered with support for a nationwide

educational enrichment program for underserved communities in which

congressional leadership, governors, and business leaders from across the

country expressed interest. The program enjoyed its world premiere at The

John F. Kennedy Center for the Performing Arts during President Obama's

first inaugural. The program received accolades from The Kennedy Center

and a proclamation from former Washington, D.C., Mayor Adrian Fenty.

As Mayor Fenty's office expressed interest in working with Plaintiff on

future programs, Plaintiff did return to Washington, D.C., in August and

October 2011 to work jointly with the city's administration and the D.C. Arts

Commission to provide program services for area schools in conjunction

with the unveiling of The Dr. Martin Luther King, Jr., Memorial.

Paragraph 74

Six months prior to Plaintiff's work in Washington, D.C,

regarding the MLK Memorial, Plaintiff was with his wife out

of town following a death in the family.  Plaintiff was driving

to the governor's office of the state for a meeting about the

project that Plaintiff had spearheaded honoring President

Obama.  Similar discussions had been initiated with

Congressional members and governors across the country who

had also expressed interest in the project.  Enroute to the

meeting, Plaintiff and his wife were suddenly surrounded by

sheriff deputies who stopped Plaintiff's vehicle and drew as

many as a half-dozen guns on Plaintiff and his wife.  Plaintiff

would subsequently learn that Gilbert and his business

associates orchestrated these events. Plaintiff would also learn

that he was a victim of identity theft wherein two medical

records had been generated in his name during a 2003

hospitalization wherein Plaintiff was placed on the floor of a

makeshift morgue.  Plaintiff also learned that his name was

Plaintiff and his wife hired an attorney listed with an address

in a city where Plaintiff had never lived nor had any

connection. (Plaintiff had previously discovered a falsified

corporate resolution which showed that Gilbert and his

associates were using Plaintiff's corporate name for their

monetary gain.  who told Plaintiff that their civil rights had

been violated because of all that transpired. The attorney told

Plaintiff that he would file a federal lawsuit but the attorney

never followed through.

Paragraph 75

Gilbert and his associates interfered in Plaintiff's program

expansions designed to help bereaved communities dealing

with gun violence, including Parkland, Florida, where

congressional leadership includes Congressman Ted Deutch

of the U.S. House Ethics Committee.

Paragraph 76

Plaintiff met with Gilbert's real estate team in June 2013 during

which promises were made to follow through on completion of

Plaintiff's development project. included the promise of a

turnkey option that Plaintiff could utilize for a special event for veterans in a proposed joint project with The Gary Sinese Foundation which services veterans.  The meeting was arranged after Plaintiff sent Gilbert and his team a compilation of Plaintiff's corporate history and programming accomplishments spanning over three decades. Gilbert and his team never followed through on anything discussed during the meeting. Instead, there was more stalling and, eventually, Gilbert bulldozed the nearly completed facility.

Paragraph 77

Following that meeting, there was an attempted assault on Plaintiff at a state park near Plaintiff's former residence which Plaintiff reported to local police. Plaintiff believed that Gilbert and his cohorts were behind the incident as well as several burglaries at Plaintiff's development site, events which Plaintiff also reported to local authorities.

Paragraph 78

Before Plaintiff left the parking area of his residence on the morning of the incident at the state park, Plaintiff noticed a man who looked unfamiliar and was acting peculiar, shining a light into Plaintiff's car.

Paragraph 79

When Plaintiff arrived at the park, Plaintiff noticed several vehicles with their headlights on parked near the area of Plaintiff's walking route.  Plaintiff recognized this to be unusual activity in that it was not quite 5:00 am and only the regular walkers visited the park at this hour. Plaintiff again saw someone aim a light inside Plaintiff's car.  Plaintiff then saw a group of people assembled wearing what appeared to be white, Klansmen-like apparel and carrying what appeared to be sharp objects in their hands. Plaintiff did not get out of his car but instead headed straight to the police precinct station at the park as Plaintiff recognized that the group was heading towards him and intended to do him harm.  Plaintiff reported the incident at the precinct and filed a police report.

Paragraph 80

In July 2019, while Plaintiff was in the Washington, D.C., area
and after Plaintiff met with Congressman Cummings' office,
Plaintiff and his wife were seriously injured in a major auto
accident. Plaintiff's wife had to have surgery, endured a month in
the hospital, and months in rehabilitation.  Plaintiff suffered at
least two ischemic strokes, multiple fractures in his back and also
had to undergo rehabilitation.  The police officer at the accident
scene altered the report by misrepresenting what happened.
However, records show that the other driver, who had a history of
traffic violations, ran a red light, broadsiding Plaintiff's car, and
pinning his wife inside.  While Plaintiff's attorney corrected the
information, the attorney never followed through on completing
his representation by filing a lawsuit to recover Plaintiff's
medical expenses and vehicle loss. Gilbert owns a casino in the
Washington, D.C./Baltimore area. Plaintiff believes that Gilbert
was involved in the accident, the inaccurate police report, and the
attorney's failure to respond to Plaintiff's phone calls, emails and
inquiries about attorney's follow through on representation.